UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF<br>THE EXTRADITION OF<br>JOSHUA MOSES MORALES<br>aka Josue Moises Morales<br>_____ / | 1:10-mc-00008-SMS<br><br>**CERTIFICATION OF EXTRADITABILITY**<br>**-AND-**<br>**ORDER OF COMMITMENT** |

## I. INTRODUCTION

This is an extradition proceeding pursuant to 18 U.S.C. § 3184 in which Mexico, through the United States ("Government"), seeks the extradition of Joshua Moses Morales ("JMM"). The extradition request is based upon a 1978 Treaty entered into between the United States and Mexico. Mexico requests JMM's extradition for the crime of aggravated homicide.

On February 24, 2010, a complaint for provisional arrest of JMM was filed by the Government (Doc. 1). Acting on the complaint, this Court issued a warrant on February 24, 2010, for the provisional arrest of JMM under 18 U.S.C. § 3184 (Doc. 2). After the arrest of JMM on the provisional warrant, he was arraigned by Magistrate Judge Gary S. Austin on March 3, 2010, and ordered detained (Doc. 4). On October 22, 2010, the Government filed a "Brief in Support of Extradition" which contained supporting documents required under the Treaty (Doc. 21). JMM filed an "Opposition to Extradition" on November 22, 2010 (Doc. 29). On December 9, 2010, the Government subsequently filed a "Reply Brief in Support of Extradition" (Doc. 30).

1

On January 11, 2011, an extradition hearing was held (Doc. 31).[1] JMM personally appeared by, through, and with the assistance of his attorney, Deputy Federal Defender Victor Chavez. Assistant United States Attorney Ian Garriques personally appeared on behalf of the Government. At the hearing, the Court admitted the Government's sealed exhibits numbered 1, 2, 3, 4 and 5 (with subparts) into evidence.

Upon consideration of all of the filings, evidence, and arguments presented, the Court finds that Joshua Moses Morales is extraditable to Mexico for the offense requested, aggravated homicide, and certifies this finding Her Excellancy Hillary Rodham Clinton, Secretary of State, as required under 18 U.S.C. § 3184.

## II.  LEGAL STANDARD

The Court's inquiry at an extradition hearing is to determine the following: (1) whether the undersigned judicial officer is authorized to conduct the extradition hearing; (2) whether jurisdiction lies; (3) whether there is an extradition treaty in full force and effect between the requesting state (Mexico) and the requested state (United States); (4) whether the crime alleged in the charging instrument is covered by the Treaty; and, (5) whether competent legal evidence amounting to probable cause establishes that there is good reason to believe that the extraditee committed the crime alleged. Ornelas v. Ruiz, 161 US 502, 510 (1896); Zanazanian v. United States, 729 F. 2d 624, 626 (9th Cir. 1984).

If the Court determines that all the requisite elements have been met, the findings are incorporated into the certificate of extraditability. The certificate is forwarded to the Department of the State. The Secretary of State makes the final decision on whether to surrender the respondent. 18 U.S.C. § 3186.

## III.  DISCUSSION

A.     Requirements for Extradition

   1.     *Authority of the Judicial Officer*

Pursuant to 18 U.S.C. § 3184 and Eastern District of California Local Rule 302(b)(8), a magistrate judge is authorized to conduct an extradition hearing; hence, this requirement is met.

---

[1] Mr. Morales is a U.S. citizen, speaks English, and did not require the services of an interpreter.

2.      *Jurisdiction Over the Individual Sought*

JMM is currently in custody in the Eastern District of California. Accordingly, this Court has personal and subject matter jurisdiction over him. See, In re Pazienza, 619 F. Supp. 611, 616-18 (S.D.N.Y. 1985). JMM has not challenged this requirement.

3.      *Validity of the Treaty*

On October 25, 2010, under seal, the Government filed a declaration of Alexis R. Blane, an Attorney Advisor in the Office of the Legal Adviser for the Department of State, which certifies that there is a valid extradition treaty in force between the United States and Mexico. Declaration of Alexis R. Blane, dated March 11, 2010, Gov't. Exh. #4; See also Doc. 23-4. A copy of the Treaty is attached to Ms. Blane's declaration. Id. Accordingly, the Court takes judicial notice that there is an extradition treaty in full force and effect between the United States and Mexico which was signed at Mexico City on May 4, 1978, and entered into force on January 25, 1980 ("Treaty").

4.      *Treaty Coverage*

On April 26, 2010, the Government filed the extradition request and accompanying documents, including International Arrest Warrant and citations to the applicable Mexican penal codes (Doc. 23-1).[2] These documents indicate that Mexico requests the extradition of JMM for the crime of aggravated homicide. This offense is punishable under the laws of both Mexico and the United States with a maximum prison sentence of no less than one (1) year, as established by Article 2, paragraph 3 of the Extradition Treaty between the United Mexican States and the United States of America in relation to item 1 of the Treaty's Appendix (Doc. 23-2).

As a preliminary matter, Article 2 of the extradition treaty requires that only offenses which carry a deprivation of liberty, the maximum of which shall not be less than one (1) year, qualifies for extradition. Article 2 § 1. Inasmuch as the crime of aggravated homicide is

---

[2] The Court finds that these documents comply with the requirements of 18 U.S.C. § 3190 as the declaration of Alexis Blane certifies that Carlos Pascual, the Ambassador of the United States in Mexico, was the principal diplomatic officer of the United States in Mexico at the time of her certification.

3

punishable by a deprivation of liberty, the maximum of which exceeds one (1) year in both countries, JMM would be extraditable.

5.   *Preliminary Proceedings Outside of the Filed Record*

On January 4, 2011, the Court received a handwritten letter from JMM, which letter was neither filed with the court, copied, nor made available to the Government. Rather, the Court deemed its contents to be of sufficient import such that a separate hearing, ordered sealed and on the record but outside the presence of counsel for the Government, was held on January 11, 2011 (Doc. 31). With Deputy Federal Defender Victor Chavez present, the Court carefully and slowly explained the proceedings about to be conducted to JMM. The Court assured herself that JMM was comfortable with the proceedings that were about to be conducted, and was equally satisfied with the legal representation that JMM was receiving from Mr. Chavez such that he withdrew his concerns and objections.

Among his concerns, JMM expressed his desire to have an attorney help him when he gets to Mexico (apparently assuming that he was about to be returned thereto). This concern is addressed outside of the confines of the sealing order due to the later involvement of Assistant United States Attorney Ian Garriques in determining the answer to JMM's inquiry. On or about February 9, 2010, Mr. Garriques sent an email to this Court's courtroom deputy, Harriet Herman, as well as to Attorney Chavez, advising of the information he acquired regarding access to legal counsel in Mexico: "My counterparts at the Office of International Affairs have indicated that the Mexican constitution provides that all criminal defendants will be represented by counsel, and if a defendant is indigent, he or she would be represented by a group called 'Abogados de Oficio,' similar to a public defenders' office." Both a copy of this email, as well as the original letter to the Court from JMM, will be filed, under seal, in conjunction with, but not attached to, this Certification.

6.   *Probable Cause*

The majority of JMM's arguments relate to an alleged lack of probable cause to support the charges. A central function of the magistrate judge in an extradition proceeding is not to determine guilt or innocence, but to determine whether probable cause exists to hold the

4

extraditee for trial in the requesting state.  Escobedo v. U.S., 623, F. 2d 1098, 1102 n. 5 (5th Cir. 1980).  A magistrate's function in making this determination is to ascertain whether there is "any" evidence establishing reasonable or probable cause.  U.S. ex rel Sakaguchi vs. Kaulukukui, 520 Fed.2d 726, 730-731 (9th Cir. 1975).

The admissibility of evidence in extradition matters is controlled by 18 U.S.C. § 3190. The Federal Rules of Evidence do not apply.  Fed. R. Evid. 1101(d)(3).  The standards for determining whether probable cause is established are the same as those set forth in Rule 5.1 of the Federal Rules of Criminal Procedure.  In re Extradition of Neto, 1999 WL 627426, at *3 (S.D.N.Y. Aug. 17, 1999).  Thus, the Government need only present competent legal evidence to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused.  In determining if probable cause exists, the Court can look to the "totality of circumstances."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  In other words, the Court must simply decide whether the evidence permits a reasonable belief that the person whose extradition is sought committed the crime.  In re Ribaudo, 2004 WL 213021 at *5 citing Austin v. Healy, 5 F. 3d 598, 605 (2nd Cir. 1993).  This standard looks to whether there is a fair probability of guilt.  Illinois v. Gates, 462 U.S. at 238.  As explained by the Supreme Court in Illinois v. Gates, a probable cause or fair probability decision does not trigger an analysis based on finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence.  Illinois v. Gates, 462 U.S. at 235, 238-239.

Moreover, under 18 U.S.C. § 3190, hearsay is admissible.  Simmons v. Braun, 627 Fed.2d 635, 636 (2nd Cir. 1980).  The Court may even rely on unsworn statements of absent witnesses.  Id.  Although caution must be exercised when hearsay is derived from unsourced statements (Extradition of Joseph Ben-Dak, 2008 WL 1307816 at *4 (S.D.N.Y. April 11, 2008), the Ninth Circuit has held that even police reports which summarize the statements of witnesses are competent evidence.  Zanazanian v. U.S., 729 F. 2d at 627-628.

///
//
/

      a.     *Application of the Probable Cause Standard to the Charges*

          i.     Alleged Facts

The charge alleges that JMM committed aggravated homicide in violation of Articles 126 and 147 of the Penal Code of the State of Baja California.[3] As brief summary of the facts supporting this charge as outlined in Government's Exhibit 1 are as follows:

Attached to the Declaration of Ms. Blane, Attorney Advisor in the Office of the Legal Adviser for the Department of State, Washington, D.C., is an Arrest Warrant, attested to by Ambassador Julian Ventura, Charge d'Affaires, a.i.. Comparing the summary of facts set forth therein to the totality of the supporting documentation attached to the Certification supporting the extradition request of Ambassador of the U.S. Embassy in Mexico, Carlos Pascual, certified on April 15, 2010, which documentation this Court has carefully reviewed, the summary of facts contained therein is hereby adopted as follows:

> On February 6, 2009, in the Municipality of Tijuana, Baja California, JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES killed Veronica Osorio, who was then two years old.
>
> An information report dated February 7, 2009, prepared by municipal police officers in Tijuana, Baja California, stated that on that day, at approximately 5:20 a.m., they received an order from headquarters over the radio to go to the downtown area of Tijuana, since apparently a girl had died in the General Hospital.
>
> When they arrived, Police Unit 4355 was there, as well as Ruth Emilia Medina Morales and Leonard Breceda Ramirez. They told him that at approximately 7:30 p.m. on February 6, 2009, they were at their home located in an unnumbered dwelling on Guadalupe Victoria street, in the Ignacio Ramirez neighborhood of Tijuana, Baja California, when JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES arrived carrying Veronica Osorio in his arms. He told them that she was sick and vomiting, so he asked them to help him by lending him their vehicle since JOSHUA MOSES MORALES, a.k.a. JOSUE

---

[3] Article 126. - Aggravated Homicide. - an imprisonment penalty from twenty to fifty years shall be imposed upon the person responsible of aggravated homicide as provided for in article 147.

Article 147. Homicide and Aggravated Bodily injuries. Bodily injuries and homicide are aggravated when they are committed with premeditation, unfair advantage, malice aforethought, or betrayal. Likewise, they shall be considered aggravated when they are committed against personnel of public security corporations in the performance or as a consequence of the performance of their duties, including the personnel of private companies and those persons that independently provide security, protection, surveillance, or safeguard persons, places or facilities services, as well as the safeguard of goods and securities including their transfer, as long as such companies are duly registered before the corresponding public institutions. This provision shall not be in effect in the case of non-serious negligent crimes.

6

MOISES MORALES was taking care of the girl.  Ruth Emilia Medina Morales, Leonard Breceda Ramirez and JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES went to the General Hospital of Tijuana, Baja California.  However, when medical attention was about to be provided to the girl, it was determined that she had died.  In addition, she appeared to have symptoms of being raped.

Ruth Emilia Medina Morales, mother of JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, declared before the Public Prosecutor of the Attorney General's Office of Baja California that on February 6, 2009 at approximately 7:30 p.m., she was in her apartment with Leonard Breceda Ramirez, when suddenly her son JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES arrived, carrying the girl Veronica Osorio in his arms.  She was wrapped in a wet blanket, and the deponent's son told her "Mom, I need you to take me to the hospital because the girl is really sick", so Ruth Emilia Medina Morales, Leonard Breceda Ramirez and JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES immediately took her to the hospital.

While they were in the emergency area of the General Hospital, and after the doctors checked Veronica Osorio, they told Ruth Emilia Medina Morales that the girl appeared to be dead.  The doctors also questioned her as to why the body of the girl had signs of beatings, and that she had been sexually abused several times.  Ruth Emilia Medina Morales responded that she didn't know anything.

Ruth Emilia Medina Morales exited the hospital and looked for her son JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, who had stayed in the car waiting for her, but Leonard Breceda Ramirez told the deponent that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES became scared and ran off.  For this reason, Ruth Emilia Medina Morales believes that he ran away out of fear that he would be arrested for having committed a crime, since the doctors said that the girl had been sexually abused several times.

In addition, she stated that her son JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES had told her that he had an arrest warrant in the US for beating up a friend, so he wanted to turn himself in to the authorities in that country.

Leonard Breceda Ramirez declared before the Public Prosecutor of the Attorney General's Office of Baja California that on February 6, 2009 at approximately 8:00 p.m.,  JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES arrived at his house with the child Veronica Osorio in his arms and wrapped in a blanket, and he asked them to take him to the hospital because the girl couldn't breathe.  Leonard Breceda Ramirez, Ruth Emilia Medina Morales and JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES all took the child to the General Hospital of Tijuana.

During the ride to the General Hospital, Leonard Breceda Ramirez heard JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES telling Ruth Emilia Medina Morales that he was very depressed over the girl and that he wanted to go to the US, since he would no longer be able to live with Veronica Osorio Cantero due to the death of the girl Veronica Osorio.

//

/

7

They then arrived at the emergency room of the General Hospital, and moments later Ruth Emilia Medina Morales came out asking for her son. Leonard Breceda Ramirez told her that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES had fled the scene.

Nancy Peña Tabora declared before the Public Prosecutor of the Attorney General's Office of Baja California that on February 6, 2009, at approximately 8:00 p.m., she was at home with her husband getting ready to go to sleep, when JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES came in and told them that the child Veronica Osorio was dying. The deponent noticed that the child was on the floor covered with a towel from the waist down, and that the accused was applying pressure to the girl's chest so that she would react. The deponent stated that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES was sweating, and was desperate. Nancy Peña Tabora approached the girl and realized that she was no longer breathing.

The deponent stated that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES and his parents took Veronica Osorio to the hospital. When the parents of the accused returned, she asked them what had happened. Ruth Emilia Medina Morales (the mother of the accused) replied that Veronica Osorio had died. The deponent also asked about JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, and she was told that when he learned that the girl had died, he ran off and didn't tell them anything.

Nancy Peña Tabora declared that when JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES stayed alone with Veronica Osorio, she would cry a lot.

Veronica Osorio Cantero declared before the Public Prosecutor that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES started living with her and her three daughters after having known him for six months. Her daughters were Jenifer Monserrat Isidro Osorio, age 5, Joselin Areli Isidro Osorio, age 4, and the youngest, whom was to be registered as Veronica Osorio, age 2.

Veronica Osorio Cantero stated that she broke up with JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES several times due to relationship problems, since he was very jealous to the point that he beat her three times, and he would also drug himself. However, when she became pregnant they again decided to live together.

Thus, on February 6, 2009, Veronica Osorio Cantero left her house to go to work, while JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES stayed at home taking care of her children.

When Veronica Osorio Cantero returned home, she knocked on the door, but no one opened. Her neighbor Nancy Peña Tabora told her that her daughter Veronica Osorio had gotten sick and was taken to the hospital, so she became worried and wen to the home of her mother-in-law Ruth Emilia Medina Morales, who told her that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES had bathed Veronica Osorio in cold water, so she suffered convulsions. Veronica Osorio Cantero immediately believed this since the accused would threaten to bathe the child in cold water. In addition, Ruth Emilia Medina Morales told her that she would take her to the hospital, but that Veronica Osorio was already dead.

Veronica Osorio Cantero then went to the Forensic Medical Service, where the doctors there told her that the body bore many signs of beatings, and that the girl had been sexually abused.

The inspection conducted by the Public Prosecutor of the Attorney General's Office of Baja California on the body of the child Veronica Osorio determined that, among other lesions, her body bore a hematoma with ecchymosis located in the frontal region, edema of the upper lip on the right side, multiple ecchymoses spread throughout the area covering the chest and abdomen.

An autopsy certificate dated February 7, 2009, drafted by expert forensic doctors from the Attorney General's Office of Baja California, concluded that the child Veronica Osorio died as a result of traumatic brain injury and deep abdominal contusion.

In an identification and recognition proceeding conducted on March 3, 2009, witnesses Veronica Osorio Cantero, Ruth Emilia Medina Morales and Leonard Breceda Ramirez were presented with six color photographs of different people. They pointed out, in a clear and precise manner, the photograph in the middle of the second row labeled with the number 5 (five) as being that of JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, the person who caused the death of the child Veronica Osorio.

This Court has carefully reviewed the autopsy photos submitted with Ambassador Pascual's Certification, as well as the photograph included therein under Enclosure L, marked as number 5 of 6 photos, which photo was identified by the witnesses set forth in this factual summary as being JMM, and which photo was blown up to an 8½" x 11" size for use at the herein hearing. This Court concludes that the individual being sought for prosecution pursuant to this Request for Extradition is, indeed, the man who appeared before this Court on January 11, 2011.

## IV.  CONCLUSION

Based on the foregoing, the Court concludes the following:

1.    JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, is extraditable for the offense of aggravated homicide, and certifies this finding to the Secretary of State as required under 18 U.S.C. § 3184;

2.    IT IS ORDERED that a certified copy of this Certification of Extraditability be delivered by the Clerk to Assistant United States Attorney Ian Garriques for transmission to the Secretary of State; and,

      3.     IT IS FURTHER ORDERED that JOSHUA MOSES MORALES, a.k.a. JOSUE MOISES MORALES, be committed to the custody of the United States Marshal for this district pending final disposition of this matter by the Secretary of State and the arrival of agents of the requesting state, at which time the extraditee will be transferred to the agents of the requesting state for return to Mexico.

IT IS SO ORDERED.

**Dated:   April 29, 2011**                              /s/ Sandra M. Snyder
                                                                     UNITED STATES MAGISTRATE JUDGE